**ENTERPRISE CAPITAL, INC., Plaintiff,**

v.

**The SAN–GRA CORPORATION and United States Fidelity and Guaranty Insurance Company, Defendants.**

No. CIV.A. 02–10009–WGY.

United States District Court, D. Massachusetts.

Aug. 12, 2003.

of the bodily injury culminating in Logan's death on January 31, 2001.

Linda E. Alario, Alario & Associates, P.C., Syracuse, NY, Amato J. Bocchino, Bernkopf, Goodman & Baseman, Boston, MA, Peter B. McGlynn, Bernkopf, Goodman & Baseman, Boston, MA, William R. Moriarty, Murphy & Michaels, LLP, Boston, MA, Robert D. Ryan, Electric Insurance Company, Beverly, MA, for Defendants.

W. Mark Russo, Ferrucci & Russo, PC, Providence, RI, for Plaintiff.

## MEMORANDUM

YOUNG, Chief Judge.

This case involved a dispute over payment and performance surety bonds (the "Bonds"). The plaintiff and obligee on the Bonds, Enterprise Capital, Inc. ("Enterprise"), claimed that the defendants, the San–Gra Corporation ("San–Gra"), the principal on the Bonds, and United States Fidelity and Guaranty Insurance Company ("USF & G"), the surety, breached the Bonds. Enterprise further claimed that USF & G violated Massachusetts General Laws chapters 93A and 176D. On June 2, 2003, this Court issued an order entering summary judgment to San–Gra and USF & G. This memorandum explains the reasoning behind the Court's decision.

## I. INTRODUCTION

### A. Facts [1]

In or about 1999, John and Marjorie Warfield ("the Warfields") applied to Enterprise for $2,500,000 in construction loans ("loans") in order to purchase and develop the Barton Hill Industrial Area in Bellingham, Massachusetts (the "Project"). USF & G's Mem. in Support [Docket No. 55] at 1; Pl.'s Mem. in Support [Docket No. 51] at 1; San–Gra's Mem. in Support [Docket No. 56] at 1. These loans were guaranteed by the United States Department of Agriculture (the "USDA") and thus required a "bonded" general contractor (a general contractor whose performance and payment obligations are guaranteed by a surety). Pl.'s Mem. in Support at 1–2.

*The Construction Contract*

On January 20, 2000, the Warfields and San–Gra entered into a construction contract (the "Construction Contract") that required San–Gra to perform specified work for a lump sum of $992,000.00. Construction Contract (Ex. 2 to USF & G's Exs. [Docket No. 49]) at 1–3. The scope of the work was to construct building # 5 and to perform site improvement and miscellaneous code upgrades to buildings # 2, # 3, and # 4. *Id.* at Article 8.1.3. The Construction Contract was signed by Les Granger (of San–Gra) and John H. Warfield. *Id.* at 7. The contract incorporated the General Conditions of the Contract for Construction AIA Document A201–1997 (the "General Conditions"). *Id.* at Article 8.1.2. These conditions state that the Contractor needs to supervise the work to his best skill and knowledge, is responsible for the acts and omissions of subcontractors, and "shall employ a competent superintendent ... who shall be in attendance at the Project site during performance of the Work." *Id.* at Articles 3.9.1, 3.3.1, 3.3.2.

On May 9, 2000, a change order revised the scope of work, eliminated architectural

---

[1]. Unless otherwise indicated, the facts presented herein are undisputed.

services, and changed the sum due San–Gra from $992,000 to $793,000. Change Order No. 1 (Ex. B to Pl.'s Mem. in Support).

*The Performance Bond*

USF & G stood surety for San–Gra pursuant to the Payment and Performance Bonds issued on January 20, 2000 in connection with the Construction Contract. The Bonds (Ex. A to Pl.'s Mem. in Support). The Performance Bond named San–Gra as principal, named the Warfields as owner and obligees, and incorporated the Construction Contract by reference. Perf. Bond (Ex. 5 to USF & G's Exs.) at 1 and ¶ 1.

*The Subcontractor Contract*

On April 1, 2000, San–Gra subcontracted all the work outlined in the Construction Contract (subject to change order No. 1) to John Warfield's construction company, Warfield Services, Inc. ("Services"). San–Gra's Mem. in Support at 2; Subcontractor Contract (Ex. 6 to USF & G's Exs.) at 1 and Article 8.1. Pursuant to the agreement, San–Gra was to act as general contractor providing construction management services related to the construction of the new pre-engineered building. *Id.* The subcontract did not provide for a minimum or fixed amount of construction management services. Rather, the construction management services were quantified at a maximum of $5000/month for 10 months. Subcontractor Contract (Ex. 6 to USF & G's Exs.). The Project architect was Jerome Dixon.

The parties do not dispute that the subcontract was a true subcontract and not an attempt by San–Gra to assign the Contract

to Warfield Services. USDA's Mem. in Support at 3. The parties also do not dispute that San–Gra and the Warfields remained obligated to each other under the Construction Contract. *Id.*

*The Construction Loan Provided by Enterprise*

On April 14, 2000, the Warfields entered into a loan agreement with Enterprise. Construction Loan (Ex. 18 to San–Gra's Exs. [Docket No. 44]) at 1. They closed on a $2,280,000 USDA-guaranteed loan and a $250,000 direct loan on April 28, 2000. *Id.* at 1, 3.

*The Collateral Assignment*

On the same day that the Warfields entered into the loan agreement with Enterprise (April 14, 2000), the Warfields assigned their purported rights under the Construction Contract to Enterprise. Collateral Assignment (Ex. 9 to USF & G's Exs.). The only limitation to the assignment was that Enterprise could not exercise any of its rights until a Default occurred. *Id.* at ¶ 1.[2]

*The Dual Obligee Rider*

On October 25, 2000, upon San–Gra's request,[3] USF & G issued a Dual Obligee Rider ("Rider") which named Enterprise as an additional obligee on the surety Bond. Rider (Ex. 10 to USF & G's Exs.).[4] According to the President of Enterprise, Robert Catanzaro ("Catanzaro"), the issuance of the Dual Obligee Rider was a condition of closing on the Warfields' loan. Catanzaro Dep. (Ex. 3 to USF & G's Exs.) at 53.

---

**2.** Although the Collateral Assignment itself is undisputed, USF & G appears to dispute the extent of the assignment. *See* USF & G's Opp'n [Docket No. 58] at 3–4 (claiming that Enterprise does not have standing to recover under the Contract).

**3.** San–Gra claims that it in turn acted at the Warfields' request.

**4.** Enterprise claims it did not receive the Rider from San–Gra until November 3, 2001.

*Events Preceding the April 24, 2001 Conference*

According to Enterprise, in February and March 2001, it notified San–Gra that the Project had exceeded the time line for construction and that the budget appeared inadequate. Pl.'s Mem. in Support at 3. Around this same time, the Warfields defaulted on their loan by failing to cure an equity deficiency and to make March 1 and April 1 payments. Forbearance Agreement (Ex. 16 to USF & G's Exs.) at 2. On March 28, 2001, Catanzaro, Enterprise's President, sent a letter to Granger of San–Gra detailing the estimates its construction inspector had prepared regarding Project completion. 3/28/01 Enterprise Letter (Ex. D to San–Gra's 56.1 Exs. [Docket No. 61]) at 1. Enterprise stated that only $120,000 remained on the Direct Loan and that there were unpaid subcontractors that might need to be paid from those funds. *Id.* Catanzaro closed the letter by stating that he "appreciate[d] [Granger's] involvement in the Project and welcome[d][his] suggestions." *Id.* at 2.

Eight days later, Enterprise requested a conference with USF & G and San–Gra pursuant to Paragraph 3.1 of the Performance Bond. 4/5/01 Enterprise Letter (Ex. 11 to USF & G's Exs). In that letter, Enterprise stated that "[p]ursuant to Paragraph 3.1 of the Bond, notice is hereby given that the undersigned is considering declaring a Contractor Default." *Id.*

On April 17, 2001, USF & G's surety claim attorney, Kim Zanotta ("Zanotta") replied by letter, identifying herself as USF & G's claim attorney and stating that she would contact San–Gra to arrange a mutual time for the conference. 4/17/01 USF & G Letter (Ex. 12 to USF & G's Exs.). That same day, San–Gra replied in writing to the earlier Enterprise letter, stating its availability to meet and requesting copies of various documents such as cancelled checks, schedules of values approved by the architect, change orders, loan documents, construction budgets, and all inspection reports. 4/17/01 San–Gra Letter (Ex. L to Pl.'s Exs.).

*The April 24th Meeting*

The conference took place on April 24, 2001, at the Project site. USF & G's Mem. in Support at 4. Zanotta's assistant Nancy Smiley ("Smiley") represented USF & G via telephone for approximately ten minutes. San–Gra and its counsel, Linda Alario,[5] participated in person, along with John Warfield and Catanzaro. *Id.;* San–Gra's Mem. in Support at 3–4; Pl.'s Mem. in Support at 4; Catanzaro Dep. Vol 1 (Ex. 1 to USF & G's Exs.) at 112–114.

It appears that by this time, Enterprise had disbursed to the Warfields all but $120,000 of the construction loan proceeds. San–Gra's Mem. in Support; 3/28/01 Enterprise Letter (Ex. D to San–Gra's 56.1 Exs.) at 1. According to Catanzaro, however, this amount was originally allocated to a project outside the scope of San–Gra's work. Catanzaro Dep. (Ex. 15 to San–Gra's Exs.) at 112.

Enterprise brought to the meeting its estimates of the scope of work left to be completed (as of April 2001), costs to complete such work, and the remaining contract balance, but neither USF & G nor San–Gra came to the meeting with any specific information. Pl.'s Mem. in Support at 4. The President of Enterprise, Catanzaro, testified that Enterprise presented an estimate of $421,000 to complete the work. Catanzaro Dep. Vol 1 (Ex. 1 to USF & G's Exs.) at 112–114. He also

**5.** John Warfield testified that Alario (San–Gra's counsel) said that she was USF & G's attorney. Dep. of J. Warfield, Vol. 1 (Ex. V. to Pl.'s Mem. in Opp'n [Docket No. 63]) at 97. Alario disputes this.

testified that during the meeting, John Warfield remarked that this estimate was too high. *Id.* The meeting ended without any resolution as to who was going to complete the Project or whether work was going to continue on it. *Id.* at 114–116. Enterprise claims it suggested to Granger that San–Gra (not Warfield Services) complete the Project, but that Granger said he wanted time to review the plans and the completion analysis. *Id.* at 115; USF & G Mem. in Support at 5. Neither the Warfields nor Enterprise stated at that meeting that they intended to declare San–Gra in default, or intended to terminate the Contract or complete the work themselves. Catanzaro Dep. Vol. III. (Ex. 14 to USF & G's Exs.) at 33–34.

*Events After the April 24, 2001 Meeting*

On April 26, 2001, Zanotta sent a letter advising Enterprise that USF & G was "confident that the San–Gra Corporation will help resolve this situation." 4/26/01 USF & G Letter, (Ex. 15 to USF & G's Exs.). She requested that Enterprise keep her informed about any significant developments and contact her if it wanted to pursue a claim. *Id.*

On May 7, 2001, Enterprise's attorney, Sarah T. Dowling, sent a letter to San–Gra requesting a copy of San–Gra's notice to USF & G regarding the subcontract and a list of all construction management services provided. Ex. 24 to San–Gra's Exs. (referencing this letter).

On May 17, 2001, Enterprise, the Warfields, and Warfields Services executed a forbearance agreement under which Enterprise and the Warfields determined the scope of the Project. Forbearance Agreement (Ex. 16 to USF & G's Exs.) ¶¶ 10, 15. The forbearance agreement stated that the Warfields would promptly hire labor for

the completion of building # 5 and, thereafter, the balance of the work, and that all work would be directed by the Warfields in conjunction with Enterprise's inspector, DCI. *Id.* The estimated cost of the work was $421,646.00. Forbearance Agreement (Ex. 16 to USF & G's Exs.) at Ex. D. To finance the work, Enterprise agreed to allocate the $120,000 remaining from the original loans and grant a new interim loan of $250,000. Forbearance Agreement (Ex. 16 to USF & G's Exs.) at 2–3. Catanzaro testified that at the time of the Forbearance Agreement, San–Gra had not been declared in default of the contract.[6]

Coincidentally, on that same day, San–Gra responded (via mail and fax) to Enterprise's attorney explaining that Enterprise had disbursed loan proceeds to Warfield Services for projects that were not part of the Project's scope and that the Construction Contract balance could not be calculated unless each expenditure for which Enterprise advanced monies was analyzed to see if that expenditure was for an item within the scope of work. 5/17/01 San–Gra Letter (Ex. 24 to San–Gra's Exs.) at 1–2. San–Gra proposed that after it reviewed the requested documents, the parties meet again to discuss San–Gra's proposal for Project completion. *Id.* San–Gra then explained that it was not required to provide notice to USF & G regarding the subcontract and had never done so. San–Gra further stated that the management services it provided were minimal and that it had received no compensation for them, explaining that "the only money San–Gra received in connection with this project was the $7920.00 joint check issued by Enterprise as compensation for the surety bonds." *Id.* at 2.

On May 31, 2001, Enterprise's attorney notified San–Gra by letter that a forbear-

---

6. According to San–Gra, San–Gra did not receive a copy of the Forbearance Agreement until discovery. San–Gra's Mem. in Support at 6.

ance agreement had been reached to disburse funds for the remaining Project work. 5/31/01 Enterprise Letter (Ex. X to Pl.'s Mem. in Opp'n). On June 5 (or 14th),[7] 2001, the information San–Gra requested from Enterprise was sent. 6/5/01 Enterprise Letter, (Ex. 25 to San–Gra's Exs). According to San–Gra, the information was received on June 18, 2001.

After receiving a notice of a payment bond claim from a concrete company, 5/4/01 San–Gra Letter (Ex. 26 to San–Gra's Exs.), San–Gra, by letter dated June 7, 2001, declared Warfield Services in default under the Services subcontract and suspended the subcontractor. 6/7/01 San–Gra Letter (Ex. 27 to San–Gra's Exs.).

The next day, work began under the Forbearance Agreement—without the knowledge of San–Gra or USF & G—in order to avoid foreclosure and shut-down. Catanzaro Dep. Vol. I (Ex. 1 to USF & G's Exs.) at 130–131; Pl.'s Mem. in Opp'n at 12. At this time, San–Gra had not yet been terminated. Catanzaro Dep. Vol. I (Ex. 1 to USF & G's Exs.) at 130–134.

Six days later, the Warfields entered into a Construction Contract to complete the Project work. Ex. 29 to San–Gra's Exs.

As of June 18, 2001, Enterprise had still not informed San–Gra or USF & G that the Warfields had started completing the Project. Catanzaro Dep. Vol. I (Ex. 1 to USF & G's Exs.) at 134. Nor had a copy of the Forbearance Agreement been provided to either party.

On June 21, 2001, Movitz (counsel for the Warfields and Warfield Services) responded to San–Gra, informing San–Gra that Enterprise and John Warfield were

going to conduct a site visit and requesting that San–Gra attend because "[a]s the general contractor on the job, we do believe that its attendance and active participation are required." 6/21/01 Movitz Letter (Ex. 18 to USF & G's Exs.) Additionally, this letter called upon the surety to honor its obligations under the Bonds and to pay any and all valid claims and provide sufficient funds necessary to complete the Project. *Id.*

This letter, however, was not addressed or copied to USF & G or its attorney. *Id.* Nor did it disclose the terms of the Forbearance Agreement or include a copy of it. Similarly, the letter disclosed neither that construction work had already begun nor that a construction contract with another contractor had already been entered into by the Warfields for completion of the work. Additionally, the letter did not state that San–Gra was in default or terminated and did not foreclose San–Gra from performing further contract work. As noted, it invited San–Gra to participate. That being said, it did state clearly that the Warfields would "proceed to procure the completion of the project" and that if San–Gra impeded or delayed the completion of the Project, it did so at its own peril. *Id.* USF & G's counsel testified that she did not receive this letter until after this litigation had commenced. Zanotta Dep. (Ex. 13 to USF & G's Exs.) at 157–158. Enterprise seems to dispute this point but does not produce any evidence to support this refutation.

Four days later, San–Gra's attorney, Alario, responded in writing to Movitz (copying USF & G). Alario stated that San–Gra was willing to complete the scope of the work once the unpaid contract bal-

---

7. The date typed on the letter is June 5th. This date is scratched out and the number 14 is hand-written above it. The President of Enterprise did not know why that was done but believed his assistant had made the change. Catanzaro Dep. Vol. I (Ex. 1 to USF & G's Exs.) at 129.

ance had been determined and San–Gra had been assured that funds were available. Alario requested that the Warfields provide evidence of their ability to pay for the work at the upcoming conference and stated that she had no knowledge of a forbearance agreement and had not seen a copy of it. 6/25/01 San–Gra Letter (Ex. 19 to USF & G's Exs.). She also warned Enterprise counsel not to presume to communicate to USF & G through her because Zanotta was USF & G's attorney. She said she would forward to Zanotta a copy of the June 21 letter along with her current letter to Enterprise. (USF & G claims it never received a copy of Enterprise's June 21 letter.) USF & G Mem. in Support at 9; 8/14/01 USF & G Letter (Ex. 25 to USF & G's Exs.).

Not having received the requested financial assurances, San–Gra, pursuant to paragraph 2.2. of the General Conditions, made written demand on the Warfields for evidence regarding the financial arrangements with Enterprise and its ability to pay. 7/9/01 San–Gra Letter (Ex. 31 to San–Gra's Exs.). This letter was not copied to Enterprise.

On August 3, 2001, Enterprise's counsel wrote a letter to USF & G claiming that (1) Zanotta's April 26 letter (Ex. 15 to USF & G's Exs.) "confirmed" that Alario represented USF & G at the April 24, 2001 conference; and (2) all Project documents had been delivered to USF & G on June 5, 2001. 8/3/01 Enterprise Letter (Ex. N to Pl.'s Exs.). Enterprise's counsel also referred to the June 21, 2001 letter (that was never sent to USF & G) and stated that "said correspondence included a request on the surety to honor its obligations under the Bond" and "notified the principal that it was in default and the right to

complete had terminated." *Id.* The record shows, however, that this is a mis-characterization of the June 21 letter. The June 21 letter did not specify that San–Gra was in default; in fact, as mentioned above, the letter requested San–Gra's participation in further work on the Project. *See* 6/21/01 Movitz Letter (Ex. 18 to USF & G's Exs.).

Lastly, counsel claimed that well over a month had gone by without an action by USF & G and that Enterprise had suffered additional damages due to delay and must now exercise its rights as a Dual Obligee under the Bond because of USF & G's failure to undertake its obligations in good faith. 8/3/01 Enterprise Letter (Ex. N to Pl.'s Exs.).

On August 7, 2001, Zanotta responded with a letter that stated that no formal claim on the Performance bond had yet been made and that Enterprise should notify her according to the notice provisions of the Contract (Article 2.3) and Performance Bond (Paragraph 3) if it wished to pursue a claim. 8/7/01 USF & G Letter (Ex. 23 to USF & G's Exs.).

Three days later, Enterprise's counsel wrote to USF & G and claimed that the Warfields had made a formal claim on the Performance Bond on or before June 25 and claimed again that Alario was and had been representing both the principal and the surety. 8/11/01 Enterprise Letter (Ex. 24 to USF & G's Exs.).[8]

Zanotta responded by letter, again making clear that Alario did not represent USF & G and that it had never received notice of the claim or the June 21 letter from Movitz. She also warned Enterprise that if it was submitting its own claim, it should explain the specific nature of that claim and the requested remedy. 8/14/01

---

8. This is a disputed issue. Enterprise submitted testimony from John Warfield that he heard Alario say that Alario also represented USF & G. The other evidence presented on the issue supports the conclusion that Alario was only representing San–Gra.

USF & G Letter (Ex. 25 to USF & G's Exs.).

On August 31, 2001, San–Gra notified Enterprise in writing that the Warfields were in default and had failed to provide the financial information as requested under 2.21 of the General Conditions. 8/31/01 San–Gra Letter (Ex. 36 to San–Gra's Exs.).

On September 4, 2001, Enterprise's attorney wrote a letter to USF & G insisting, again, that the Warfields had terminated San–Gra and made a claim on the Performance Bond and that Zanotta was copied on the June 21, 2001 letter.[9] Enterprise did not enclose a copy of the June 21, 2001 letter. 9/4/01 Enterprise Letter (Ex. 26 to USF & G's Exs.). Enterprise's attorney explained that he believed he had met the requisites of Paragraph 3 (notice of the default and termination). *Id.* Lastly, he mentioned that another contractor had determined the scope of the work and was prepared immediately to go forward. *Id.*[10]

Various communications ensued between Enterprise and USF & G. In essence, USF & G kept requesting a current accounting and punch lists along with documentation proving that San–Gra had been formally terminated. Enterprise does not appear to have provided the documents requested but responded by asserting that it had formally terminated San–Gra via the June 21 letter and that USF & G should proceed with its obligations under the Bond. *See, e.g.,* 9/4/01 Enterprise Letter (Ex. 26 to USF & G's Exs.); 9/5/01 USF & G Letter (Ex. 27 to USF & G's Exs.); 9/17/01 Enterprise Letter (Ex. 29 to USF & G's Exs.); 9/18/01 USF & G Letter (Ex. 30 to USF & G Exs.); 9/21/01 USF & G Letter (Ex. 32 to USF & G's Exs);

11/12/01 USF & G Letter (Ex. 33 to USF & G's Exs.). In early September, USF & G began an investigation. USF & G's Mem. in Support at 10. In October, based on the information it then had, USF & G provided an estimate of the amount it would cost to complete the work. 10/30/01 Report (Ex. 32 to USF & G's Exs.).

On November 21, 2001, Enterprise informed USF & G that it intended to file this lawsuit. 11/21/01 Enterprise Letter (Ex. 34 to USF & G's Exs). By this point, the Warfields had substantially completed the Contract Work at an alleged cost of $350,000. The only Contract Work purportedly remaining was paving and landscaping at an alleged estimate of $45,000. Catanzaro Dep. Vol. II. (Ex. 3 to USF & G's Exs.) at 18; Catanzaro Dep. Vol. III (Ex. 14 to USF & G's Exs.) at 43–44, 49; USF & G Mem. in Support at 11.

On January 2, 2002, Enterprise filed the instant complaint, alleging that San–Gra and USF & G had breached the Bonds [Count One] and that USF & G had violated Mass. Gen. Laws chs. 93A and 176D [Count Two].

On January 14, 2002, USF & G tendered performance (offer to complete the remaining work) under Paragraph 4.2 of the Performance Bond. Ex. 35 to USF & G's Exs.; USF & G's Mem. in Support at 12; Enterprise Mem. in Support at 5. At that point, however, Enterprise had already advanced the additional funds necessary to complete the Project. *Id.* Enterprise claims that it needed to do so to avoid foreclosure and triggering the USDA guaranty. *Id.* USF & G claims it tendered performance without knowing that the Project already had been completed, and that it reserved its rights when it did so.

---

**9.** This latter assertion is simply not accurate. The June 21 letter bears no indication of a copy to Zanotta.

**10.** As noted above, it is undisputed that by this time completion work had already begun and a contract had already been signed with another contractor.

USF & G's Mem. in Support at 12. By the time USF & G took this action, of course, Enterprise had already commenced this lawsuit.

### B. Governing Law

The parties do not appear to dispute that any issues regarding the Bonds' enforceability, interpretation, and validity should be governed by Massachusetts law. *See, e.g.,* San–Gra's Reply Mem. in Support [Docket No. 67] at 2–3; USF & G's Reply [Docket No. 68] at 4; Pl.'s Compl. (suing for breach of Mass.G.L. c. 93A). Although the Bonds themselves are silent on the issue, the General Conditions of the Construction Contract state that "[t]he Contract shall be governed by the law of the place where the project is located." Article 13.1 of the General Conditions, Ex. C to Pl.'s Mem. in Support. The Project was located in Massachusetts. The Performance Bond incorporates the Construction Contract by reference. *See* Perf. Bond (Ex. 5 to USF & G's Exs.) ¶ 1. Moreover, the 3.1 meeting was held in Massachusetts. Therefore, the applicable law is Massachusetts law. *See, e.g., U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.,* 219 F.Supp.2d 403, 474–76 (S.D.N.Y.2002) (relying on similar factors to determine what law to apply to a Performance Bond).

### C. Standard of Review

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505. A fact is material when it "might affect the outcome of the suit under the governing law."

*Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993). In making its determination, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.* The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the non-moving party must "go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a material issue for trial." *Id.* at 323–324, 106 S.Ct. 2548 (internal quotation marks omitted).

Cross motions for summary judgment, as presented in this case, do not alter the basic summary judgment standard. *Adria Int'l Group, Inc. v. Ferre Dev., Inc.,* 241 F.3d 103, 107 (1st Cir.2001); *Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir.1996) ("Cross motions for summary judgment neither alter the basic Rule 56 Standard, nor warrant the grant of summary judgment *per se.*").

## II. DISCUSSION

### A. USF & G's Summary Judgment Motion

USF & G argues that its obligations to perform under the Performance Bond were discharged and that summary judgment should therefore be granted in its favor. USF & G's Mem. in Support at 12–15, 17, 19. Specifically, it claims that the Warfields and Enterprise (1) defaulted on and materially breached the Construction Contract as defined in Paragraph 12.4 of the Performance Bond; and (2) breached

the Performance Bond by failing to notify USF & G of San–Gra's alleged default and failing to comply with conditions precedent of the Performance Bond as outlined in Paragraph 3. *Id.*

USF & G also seeks summary judgment in its favor as to the Chapter 93A claim for the same reasons and because "a surety cannot be liable for unfair claims settlement practice when there is no liability on the underlying obligation." *Id.* at 19.

According to the Performance Bond, the surety's obligations only arise under certain circumstances:

> *If there is no Owner Default,* the Surety's obligation under this Bond shall arise *after:*
>
> 3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and Surety …; and
>
> 3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract …;and
>
> 3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety …

Perf. Bond (Ex. 5 to USF & G's Exs.) ¶ 3 (emphasis added). Owner default is defined as "[f]ailure of the Owner, … to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof." *Id.* ¶ 12.4. "Contractor Default," referred to above, is defined as "[f]ailure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract." *Id.* ¶ 12.3.

## 1. Default On The Construction Contract

■ Note that the Performance Bond states that the surety's obligation arises only "[i]f there is no Owner default." Perf. Bond (Ex. 5 to USF & G's Exs.) ¶ 3. This provision is clear and unambiguous and must be given its plain and ordinary meaning. *See, e.g., Gordon & Dilworth v. Abbott,* 258 Mass. 35, 38, 154 N.E. 523 (1926) ("The liability of a surety or guarantor is to be ascertained from the terms of the written instrument by which his obligation is expressed, construed according to the usual rules of interpretation in the light of the subject-matter, and the well-understood usages of the business, and the relations of the parties to the transactions. Where the words are unambiguous they alone can be examined to determine their meaning."). Therefore, if the Warfields failed "to comply with the other terms" of the Construction Contract, as USF & G contends, they were in default; and USF & G is not obligated to perform. Performance Bond ¶ 12.4; *see also Roel Partnership v. Amwest Surety Insurance* Co., 258 A.D.2d 780, 781–82, 685 N.Y.S.2d 832 (1999) (interpreting New York law and granting summary judgment in favor of surety because owner failed to make progress payments to the principal, resulting in a default under the performance bond).

■ The Performance Bond and Rider incorporate the Construction Contract and therefore must be construed in accordance with it. The relevant provision of the Construction Contract is section 14.2.2, which states that when an owner has cause to terminate,

> the Owner, upon certification by the Architect that sufficient cause exists to justify such action, may without prejudice to any other rights or remedies of the Owner after giving the Contractor and the Contractor's surety, if any seven

days' written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety ... finish the Work by whatever reasonable method the Owner may deem expedient. Section 14.2.2. The Collateral Assignment requires the same prior written notice from Enterprise. *See* Collateral Assignment (Ex. 9 to USF & G's Exs)¶ 8.[11]

■ Here, the undisputed evidence shows these requirements were not met before the Warfields began finishing the work on June 8, 2001.[12] The earliest date upon which Enterprise claims that any party declared a default or terminated San–Gra is June 21, 2001—via the 6/21/01 Movitz letter addressed to San–Gra detailed above. Even assuming this letter was sufficient to declare a default and terminate San–Gra's rights—which it was not[13]—this letter was sent weeks after (instead of seven days prior to) starting completion of the contract work.[14]

This default represents a material breach of the Construction Contract. *See* *Providence Washington Ins. Co. v. Beck,* 356 Mass. 739, 740, 255 N.E.2d 600 (Mass. 1970) (holding that contractor's failure to comply with seven-day notice provision before termination was substantial breach); *see also Bouchard v. Boyer,* No. CIV.A. 543089, 1999 WL 335845, at *6 (Conn.Super.Ct. May 17, 1999) (construing identical contract language and holding owner's failure to comply was a material breach) (unpublished opinion);[15] *Dragon Construction, Inc. v. Parkway Bank & Trust,* 287 Ill.App.3d 29, 33–34, 222 Ill.Dec. 648, 678 N.E.2d 55 (1997) (Illinois law) (same); *United States v. Centex Construction Co.,* 638 F.Supp. 411, 413 (W.D.Va.1985) (Virginia law) (barring subcontractor's claims because of its failure to comply with a notice provision).

Enterprise's argument that a compensated surety cannot be discharged on technical grounds unless it can prove injury, loss, or prejudice is inapplicable here. Pl.'s Mem. in Support at 1–2, 4. It is true, as Enterprise contends, that compensated

11. As between the Warfields and Enterprise, *one* of those two entities had the duty under the Construction Contract to provide this notification. Here, neither did so.

12. With regard to the obligation to get a certification from the architect, Enterprise argues it was relieved of this obligation because the architect was removed from the Project as of the first change order. Pl.'s Mem. in Opp'n at 13. San–Gra, however, submits undisputed evidence that the architect, Jerome Dixon, continued to perform services as the owner's architect for the Project but evidently did it on an as-needed assignment basis. San–Gra's Reply Mem. in Support at 8. Thus, there does not appear to be any reason why the Court should relieve the owner of this obligation under the contract when it could have asked the architect to certify the grounds to terminate the contract. USF & G, however, does not appear to argue this issue (although San–Gra has) and it is not necessary to the Court's decision. Therefore, the Court did not consider the matter in rendering its ruling.

13. *See infra* section II.B.2.a. for the Court's reasoning regarding the June 21st letter.

14. Enterprise argues that the only work that was done prior to the June 21 letter was that "to avoid having the project shut down and/or cited for violations" and for the purpose of mitigating damages. *See* Pl.'s Mem. in Support of Objection at 12. Enterprise, however, cites to no cases that support this course of action. Furthermore, as will be discussed *infra,* San–Gra was never adequately terminated and, therefore, the relevant time period is not just the month of June, but all the months leading up to this lawsuit. Thus, this argument fails.

15. The Connecticut rule is that unpublished opinions may be cited before judicial authority as long as a copy of the opinion is provided to the court and all the parties. *See* Court Rules Super CT Gen. § 5–9 (1998). The unpublished case cited here, *Bouchard,* is available on Westlaw and, therefore, appropriately cited by the Court.

sureties such as USF & G are not favored by the law. *See, e.g., Maryland Casualty Co. v. Dunlap,* 68 F.2d 289, 291 (1st Cir. 1933); *See* Pl.'s Mem. in Opp'n at 6. Indeed, Massachusetts courts have held that lack of prompt notice to the compensated surety of a contractor's default (as required by a Performance Bond) does not discharge the surety if it is not harmed. *See, e.g., Bayer & Mingolla Constr. Co., Inc. v. Deschenes,* 348 Mass. 594, 603, 205 N.E.2d 208 (1965) (noting that a notice requirement was implied by the bond but that a compensated surety is not discharged for lack of prompt notice if not harmed); *cf. John W. Egan Co., Inc. v. Major Constr. Mgmt. Corp.,* 46 Mass.App. Ct. 643, 709 N.E.2d 66, (1999) ("It has long been settled in the Commonwealth that, in the absence of a provision in the bond to the contrary, it is up to the (compensated) surety to keep itself informed of any defaults on the part of the principal; it is not the task of the creditor to inform and give notice to the surety.").

Here, however, USF & G is not claiming discharge simply because it, as surety, did not have notice of contractor default as required by the Bond, but rather because San–Gra—the *principal*—was not notified as required by the Bond and the Construction Contract. Moreover, the seven-day notice requirement in the Construction Contract exists precisely to provide the surety an opportunity to protect itself against loss by participating in the selection of the successor contractor to ensure that the lowest bidder is hired and damages mitigated. *See Dragon,* 287 Ill. App.3d at 33–34, 222 Ill.Dec. 648, 678 N.E.2d 55; *cf. Seaboard Surety Co. v.*

*Town of Greenfield,* 266 F.Supp.2d 189, 195–96 (D.Mass.2003) (Freedman, J.) (holding that owner "absolutely deprived [the surety] of its rights under the Bond" when it contracted with a different contractor without first allowing the surety opportunity to fulfill its completion options under Paragraph 4 of the Performance Bond). As one court recently noted, "courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a Performance Bond constitutes a material breach, which renders the bond null and void." *Sch. Bd. of Escambia County, v. TIG Premier,* 110 F.Supp.2d 1351, 1354 (N.D.Fla.2000) (collecting cases); *see also North Am. Specialty Ins. Co. v. Chichester Sch. Dist.,* No. CIV.A.99–2394, 2000 WL 1052055, at *14 (E.D.Pa. July 20, 2000) (ruling that owner default is a breach of obligations and therefore prejudices the surety). Thus, even if USF & G must show injury, loss, or prejudice, it meets this hurdle, given its deprivation of mitigation opportunities.[16]

 Similarly without merit is Enterprise's argument that the Warfields (and Enterprise) were relieved of their notification obligations because San–Gra failed to perform its job as general contractor and USF & G knew or should have known about that failure—that is, that San–Gra's alleged breach excused Enterprise from its duty to adhere to the seven day notification period. Pl.'s Suppl. Mem. in Support [Docket No. 72] at 1–2. Enterprise supports this argument with a citation to a single case, *Providence Washington.* Al-

---

16. Although many courts, instead of discharging liability, reduce liability to the extent the prejudice affected the surety's ability to minimize its expenses, *see, e.g.,* Richard S. Wisner & James A. Knox, *The ABC's of Contractors' Surety Bonds,* 82 Ill. B.J. 244, 247 (1994), the Court declines to do so here for two reasons.

First, as noted, this is not a simple failure to notify the surety of contractor default but rather a failure even to notify the principal. Second, the Court has also found that conditions precedent of the Performance Bond were not met, *see supra* section II.B.2, which also relieves the surety of its obligations.

though this case discusses the circumstances in which one party waives its right to declare the other party in breach,[17] *Providence Washington* does not support Enterprise's argument. On the contrary, *Providence Washington* indicates that when one party (such as Enterprise) fails to object to another party's breach or default (such as the alleged default of San-Gra in its performance as general contractor), it waives its right to use breach as an excuse for noncompliance with the contract terms.[18] As applied to this case, this proposition makes perfect sense. The entire purpose of the seven-day written notice requirement in the Construction Contract is to set forth the manner in which an owner must respond to a contractor's failure to perform. To argue that the contractor's failure to perform his job is a material breach that relieves the owner from its duties to notify the contractor that he is in breach (or default) is therefore circular and illogical. *Providence Washington* does not stand for this contrary proposition. Therefore, even accepting Enterprise's allegations as true—as the Court must in analyzing this summary judgment motion against Enterprise—that San-Gra failed to perform and USF & G knew about it, Enterprise (and the Warfields), by continuing to allow San-Gra to participate in the manner that it did without objection,[19] waived its right to use this failure as an excuse for not complying within the requisite seven days.

In sum, the Warfields failed to provide seven days written notice before starting work and hiring a successor contractor. Even if the June 21 letter was a letter of default, it was too late. Thus, the Court ruled that the Warfields defaulted and materially breached the Construction Contract, thereby excusing USF & G from its liability under the Performance Bond.[20]

---

17. In *Providence Washington*, the Supreme Judicial Court ruled that the contractor had waived its rights to use the owner's purported breach (in that the owner had previously made late payments) as an excuse for noncompliance with the seven-day written notice provision, because it had previously accepted late payments from the owner and had continued to perform under the contract. 356 Mass. at 740, 255 N.E.2d 600. Further, it held that failure to comply with a seven day written notice requirement, as required under a construction contract, is a substantial breach that relieves the other party of any further obligations. *Id.*

18. In *Providence Washington*, the party that was held to the strict notice requirement was the contractor and the party that was relieved of its obligations was the owner. *Providence Washington*, 356 Mass. at 740, 255 N.E.2d 600. In the case before the Court, the tables are turned; but the analogy applies just the same. Here, the owner is being held to strict compliance with the written notice requirement; the owner waived its rights to use breach as an excuse because it allowed the contractor to continue to perform as it always had.

19. Instead of objecting, Enterprise praised San-Gra's work. As late as March 28, 2001, Enterprise sent a letter to Granger of San-Gra noting, among other things, that it "appreciate[d][his] involvement in the project and welcome[d][his] suggestions." 3/28/01 Enterprise Letter (Ex. D to San-Gra's 56.1 Exs.) at 2. This letter is akin to the Contractor's acceptance of the Owners late payments in *Providence Washington*. Moreover, by holding a 3.1 meeting in compliance with the Performance Bond, Enterprise waived any argument that San-Gra's failure to act as General Contractor relieved it of its obligations to comply with the Performance Bond and the contracts incorporated therein.

20. USF & G argues that the Warfields were also in default for not complying with San-Gra's written demand for financial assurances made on July 9, 2001. This argument is weaker than the first and is not clearly meritorious. Because the Court has already decided that the Warfields defaulted and materially breached the Construction Contract by failing to comply with section 14.2.2, it declines to consider this alternate default argument.

## 2. Failure to Meet Conditions Precedent of the Performance Bond

Although the Court has already determined that owner default relieved USF & G of its obligations to perform under the Performance Bond, there is an alternative reason the Court granted summary judgment in favor of USF & G. Neither the Warfields nor Enterprise met all the obligations of Paragraph 3 of the Performance Bond. USF & G argued strenuously at the motion hearing on May 29, 2003, and in its submissions that Enterprise did not adequately notify USF & G of Contractor Default and termination. *See, e.g.,* USF & G's Mem. in Support at 14–15. The Court's decision, however, rests on the fact that neither the Warfields nor Enterprise declared *to San–Gra* that San–Gra was in default or *formally terminated* San–Gra's contractual rights—both of which are conditions precedent to USF & G's performance obligations. Perf. Bond (Ex. 5 to USF & G's Exs.) ¶ 3.2.[21]

While no specific declaration and termination procedure is described by the Bonds themselves, the Bonds incorporate the Construction Contract by reference and must therefore be read in accord with it. *See, e.g., General Ins. Co. of America v. K. Capolino Const. Corp.,* 903 F.Supp. 623, 627 (S.D.N.Y.1995). Therefore, Section 14.2 of the General Conditions, which sets out the requirements for the termination of contractual rights, governs the manner in which the Warfields or Enterprise might have formally terminated the contract. Section 14.2.2, as discussed *supra,* requires architect certification and seven days advance notice of termination sent in writing to both the contractor and the surety.

■ Putting aside the architect certification and advance notice requirements, the record shows that San–Gra was never adequately terminated in writing at all. As Enterprise requests, Pl.'s Suppl. Mem. at 6, the Court has considered the following letters to determine if they—individually or in combination—are "clear, direct, and unequivocal" notice of termination: 6/21/01 Movitz Letter (Ex. 18 to USF & G's Exs.), 6/25/01 San–Gra Letter (Ex. 19 to USF & G's Exs.), 8/3/01 Enterprise Letter (Ex. 22 to USF & G's Exs.), 8/11/01 Enterprise Letter (Ex. 24 to USF & G's Exs.), and 9/4/01 Enterprise Letter (Ex. 26 to USF & G's Exs.). *Seaboard Surety Company,* 266 F.Supp.2d 189, 196–97; *cf. North American Specialty,* 2000 WL 1052055, at *1 (accepting a letter as sufficient to terminate the contractor's rights when that letter clearly stated the termination and listed several reasons for it); Wisner & Knox, *The ABC's of Contractors' Surety Bonds,* 82 Ill. B.J. at 246 ("The

---

**21.** Whether the provisions outlined in Paragraph 3 of the Performance Bond are conditions precedent is a question of law for the Court to decide. *See Drake Fishing, Inc., v. Clarendon American Ins. Co.,* 136 F.3d 851, 853 (1st Cir.1998) (applying Massachusetts law); *Shaw v. Commercial Ins. Co.,* 359 Mass. 601, 605–06, 270 N.E.2d 817 (1971); *see also Wood v. Roy Lapidus, Inc.,* 10 Mass.App.Ct. 761, 764, 413 N.E.2d 345 (1980) (noting that the court should "ascertain[] the intent of the parties as expressed in the instrument [and consider] the words used, the document taken as a whole, and surrounding facts") (internal citations omitted).

This Court has concluded that the relevant provisions were indeed conditions precedent. In support of this conclusion, the Court notes that other courts have consistently interpreted the language in this Performance Bond—"the Surety's obligation under this Bond shall arise after . . ."—to indicate the listing of conditions precedent. *See, e.g., North Am. Specialty,* 2000 WL 1052055, at *16; *Bank of Brewton, Inc. v. Intn'l Fidelity Ins. Co.,* 827 So.2d 747, 753 (Ala.2002). Moreover, the parties themselves do not appear to dispute that these are conditions precedent.

obligee must declare the default, terminate the principal, and notify the surety.")[22]

### a. The June 21, 2001 Letter

Even assuming that Alario represented both USF & G and San–Gra and that USF & G therefore "received" the June 21 letter,[23] the letter was not adequate notice or formal termination of San–Gra. Although the June 21 letter (addressed to San–Gra) stated that the Warfields would "proceed to procure the completion of the project," it did not clearly foreclose San–Gra from performing under the contract. To the contrary, it requested participation by San–Gra in furtherance of that end and referred to San–Gra as the "General Contractor on the job" in the present-tense. 6/21/01 Movitz Letter (Ex. 18 to USF & G's Exs.) at 2. This letter was not clear, direct, and unequivocal notice of termination to San–Gra and, therefore, failed to meet the requirements of Paragraph 3.2 of the Performance Bond and 14.2.2 of the Construction Contract. For the same reasons, this letter was also not adequate notice to the surety that San–Gra had been terminated.

### b. The June 25, 2001 Letter

It is unclear how Enterprise contends that the June 25, 2001, letter from Alario, San–Gra's attorney, to Movitz communicates notice and termination. 6/25/01 San–Gra Letter (Ex. 19 to USF & G's Exs.) In that letter, Alario stated that San–Gra was willing to complete the work once assured that there were funds available. *Id.* It does not confirm that Alario—even if she represented both USF & G and San–Gra—considered herself notified of termination. Thus, this letter does not meet conditions precedent of the Bond.

### c. The August 3, 2001 Letter

Although the August 3rd letter clearly stated that the Warfields & Enterprise had (via the June 21 letter) declared the contractor in default and that further work by San–Gra was terminated, it nonetheless failed to meet the requirements of the Performance Bond because it did not provide "clear, direct, and unequivocal" notice to San–Gra. *Seaboard Surety Company,* 266 F.Supp.2d 189, 196–97. First, the letter was addressed to USF & G, not to San–Gra. Second, the assertion that San–Gra had previously been declared in default and terminated is simply untrue. As mentioned above, the June 21 letter actually requested San–Gra's further involvement in the Project. Third, although San–Gra was copied on the letter, any declaration of default or termination would have to have been inferred from a statement by Enterprise that was, in fact, inaccurate. The most that this Court could conclude is that, after reading this letter, San–Gra and USF & G learned that Enterprise *believed* it had formally terminated San–Gra, even though it had not actually done so.

The August 3 letter was indeed a clear, direct, and unequivocal notice *to USF & G,*

**22.** Enterprise centers its argument on the fact that these letters provided notice to USF & G. Pl.'s Suppl. Mem. at 6. It also argues—as it did regarding owner default—that compensated sureties cannot be discharged on technical grounds absent loss, injury, or prejudice. *See supra* Section II.B.1. Again, this argument fails because the issue is not simply lack of notice to the surety but lack of termination to San–Gra, the principal. *Id.* Enterprise does not—except in regard to the June 21 letter—directly address USF & G's allegation that these letters did not actually terminate San–Gra.

**23.** Because the Court is addressing USF & G's summary judgment motion against Enterprise, the Court construes all facts in Enterprise's favor. *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993). If Alario represented both USF & G and San–Gra, it makes no difference that the letter was not sent to USF & G.

*the surety,* that stated that the contractor was in default and terminated. *See e.g., L & A Contracting Co. v. Southern Concrete Servs.,* 17 F.3d 106, 111 (5th Cir.1994) ("[I]t is vital that the declaration be made in terms sufficiently clear, direct and unequivocal *to inform the surety* that the principal has defaulted on its obligations and the surety must immediately commence performing under the terms of the bond.") (emphasis added); *cf. Ronquillo v. Korea Auto., Fire, & Marine Ins. Co., Ltd.,* No. CIV.A.A01–004, 2001 WL 1725751, at *4–5 (Guam Terr. Dec.13, 2001) (ruling that letter sent directly from owner to surety, which declared contractor in default and terminated contractor's rights, met the requirements of the Performance Bond). It was not, however, a clear, direct, and unequivocal formal declaration of termination to the contractor, that is, San–Gra. Therefore, Enterprise and the Warfields failed to meet conditions precedent of the Performance Bond and USF & G is relieved of its obligations to perform under it. *See e.g., Bank of Brewton,* 827 So.2d at 755 (affirming trial court's decision to enter summary judgment in favor of surety for Bank's failure to comply with conditions precedent of Performance Bond); *North Am. Specialty,* 2000 WL 1052055, at *16 ("Paragraph three obligations act as conditions precedent to the Paragraph 4 obligations.").

#### d. The August 11, 2001 and September 4, 2001 Letters

These two letters clearly notify USF & G (as opposed to San–Gra) that Enterprise believed that the Warfields had terminated the contract and made a claim on the Performance Bond. Again, however, these letters do not demonstrate that written notification of termination was ever actually made to San–Gra as required under the Performance Bond. Therefore, these letters do not—even in combination with all of the letters above—adequately terminate the principal, San–Gra.

### 3. Is USF & G Liable For a 93A and 176D Action When There is No Liability on the Underlying Obligation?

Based upon its determination of the above issues, the Court necessarily concludes as matter of law that USF & G's conduct was not "unfair or deceptive." *See R.W. Granger & Sons, Inc. v. J & S Insulation, Inc.,* 435 Mass. 66, 73, 754 N.E.2d 668 (2001) ("A ruling that conduct violates G.L. c. 93A is a legal, not a factual, determination."). Thus, the Court also granted USF & G's motion for summary judgment on violation of Massachusetts General Laws chapter 93A and 176D (Count II).

### C. San–Gra's Summary Judgment Motion

On April 21, 2003, San–Gra moved for summary judgment [Docket No. 40] alleging that (1) the Bond provides no remedy for breach against San–Gra; (2) any obligation under the Bond (other than participation in conferences) was precluded by the Warfields' Construction Contract defaults; and (3) the Warfields and Enterprise failed to meet the necessary conditions precedent to recover under the Bond. San–Gra's Mem. in Support at 6.

The Court need not address San–Gra's first argument for summary judgment because the second and third arguments are dispositive. Even if it is true that San–Gra breached the Construction Contract by failing to perform as general contractor, Enterprise cannot hold San–Gra liable on the Surety Bond for the same reasons that it cannot hold USF & G liable on the Surety Bond: the Warfields were in default and the conditions precedent to the Performance Bond were not met. Al-

though Enterprise can legally pursue its claims against San–Gra for breach of the Construction Contract in arbitration, it cannot attain relief against San–Gra under the Performance Bond for the reasons stated above.

## III. CONCLUSION

For the foregoing reasons, USF & G's motion for Summary Judgment [Docket No. 45] and San–Gra's Motion for Summary Judgment [Docket No. 40] were ALLOWED. Pursuant to that ruling, Enterprise's Motion for Partial Summary Judgment [Docket No. 50] was DENIED. Judgment thereupon entered for both defendants [Docket No. 71].