**SEABOARD SURETY COMPANY,**
**Plaintiff**

v.

**TOWN OF GREENFIELD, Massachusetts acting by and through the Greenfield Middle School Building Committee, Defendant**

No.  CIV.A.00–12615 FHF.

United States District Court,
D. Massachusetts.

March 7, 2003.

**190**

Bert J. Capone, Jr., Cetrulo & Capone LLP, Boston, for Seabord Surety Company, Plaintiff.

Jack D. Curtiss, Callahan, Curtiss, Carey & Gates, Greenfield, for Town of Greenfield, Defendant.

Thomas H. Hayman, Cetrulo & Capone LLP, Boston, for Seabord Surety Company, Plaintiff.

Eric H. Loeffler, Cetrulo & Capone LLP, Boston, for Seabord Surety Company, Plaintiff.

## MEMORANDUM AND ORDER

FREEDMAN, Senior District Judge.

### I. INTRODUCTION

The plaintiff, Seaboard Surety Company ("Seaboard"), brings this action against the defendant, the Town of Greenfield, Massachusetts, acting by and through the Greenfield Middle School Building Committee (the "GMSBC"), (collectively "Greenfield"), seeking a declaration that it is exonerated and discharged from any liability under a surety performance bond because the defendant materially breached the bond contract. Greenfield has filed counterclaims alleging Seaboard's negligence and material breach of that same contract. Before the Court are the parties' cross motions for summary judgment.

### II. BACKGROUND

On June 18, 1998, pursuant to the bidding provisions set forth under Massachusetts General Laws, Chapter 149, Sections 44A–H, Greenfield entered into a general contract with Interstate Construction Co., Inc. ("ICC"), to renovate the Middle School Building in Greenfield, Massachusetts (the "Project") for the contract price of $10,085,244 (the "Construction Contract"). Exh. 1.[1] At that time, ICC provided a performance bond (the "Bond") to Greenfield, as required under Massachusetts law and pursuant to the terms of the Construction Contract. Exhs. 1, 2. The Bond was amongst ICC (as the "Contractor"), Greenfield (as the "Obligee" or "Owner"), and Seaboard Surety Company (as the "Surety"). Exh. 2. The Construction Contract stipulated that the renovation work was to be substantially completed by September 1, 1999, or any reasonable extension thereof, that time was of the essence, and that ICC would work regularly and diligently to achieve substantial completion during the prescribed time for completion. Exh. 1 at Article 3.

As to Contractor Default, Paragraph 3 of the Bond provided:

3. If there is no Owner Default, the Surety's obligation under this bond shall arise after

unless otherwise noted.

---

1. For ease of reference all Exhibit numbers refer to the Exhibits submitted by Greenfield,

3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's rights to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

Exh. 2 at ¶ 3.

On November 12, 1998, and again on March 23, 2000, Greenfield notified Seaboard and ICC that it was considering declaring a Contractor Default under Paragraph 3.1 of the Performance Bond and requested a conference with both. Exh. 7. On August 24, 2000, Greenfield notified Seaboard and ICC that it was declaring ICC to be in default and was formally terminating ICC's right to complete the contract. Exh. 6. At the same time, Greenfield agreed to either pay the remaining balance of the contract price to Seaboard or to a contractor retained by Seaboard to perform the Construction Contract, in accordance with the terms of the contract. Exh. 6.

Paragraph 4 of the Performance Bond provides as follows:

4. When the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1 Arrange for the Contractor, with consent of the Owner to perform and complete the Construction Contract; or

4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4 Waive its right to perform and complete, arrange for completion or obtain a new contractor and with reasonable promptness under the circumstances:

.1 After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

.2 Deny liability in whole or in part and notify the Owner citing reasons therefor.

Exh. 2 at ¶ 4.

Following notification of ICC's alleged default, on September 25, 2000 Seaboard requested documents and information from Greenfield to aid Seaboard in its review of the default allegations and the Project status. Exh. 8. Seaboard made repeated requests for such materials over the following weeks. Exhs. 13, 18, 21, 22, 26, 29, 33, 50. Thereafter, Greenfield responded with several installments of materials, the first of which was sent on September 26, 2000. Exh. 23. Likewise, on September 26, 2000, Greenfield requested that Seaboard undertake to perform and complete the Construction Contract itself, or through its agents or independent contractors pursuant to Paragraph 4.2 of the Bond. *Id.* Greenfield further stated that it believed Seaboard needed to render a decision no later than October 20, 2000, so the work could move forward by November 4, 2000. *Id.*

Once Seaboard received the initial installment of materials for its review, it arranged a meeting with Greenfield. Exh. 25. The meeting was held on October 11, 2000, and eventually led to the Emergency Work Agreement ("EWA") to immediately enclose and protect the structure and to remedy the existing floor moisture problems. Exh. 32. The EWA was executed as of October 31, 2000, and Seaboard began to perform the emergency work pursuant to the EWA on November 6, 2000. *Id.*

On November 15, 2000, Greenfield notified Seaboard that it needed a definitive statement by November 20, 2000, as to whether Seaboard was going to undertake completion of the remaining work, because Greenfield deemed that work needed to resume by December 1, 2000 if the school

was to be ready for occupancy for the following September. Exh. 42. In its response letter of November 20, 2000, Seaboard advised Greenfield that "Seaboard is willing to perform the remedial and contract work." Exh. 43. Likewise, Seaboard informed Greenfield that it was ready to finalize the Takeover Agreement for completing the Construction Contract so that work could soon begin, but that it still needed additional information from Greenfield which it had yet to receive. *Id.* Greenfield responded to Seaboard with further revisions to the Takeover Agreement and demanded that the Takeover Agreement be finalized by November 27, 2000, and that work commence on December 1, 2000. Exh. 48. Negotiations were actively continued between the parties and on December 1, 2000, Seaboard sent Greenfield a draft final Takeover Agreement encompassing Greenfield's requested revisions to date. Exh 75. Greenfield, however, continued to request further revisions. Exhs. 51, 52, 53. Draft Takeover Agreements continued to be actively circulated back and forth between the parties through the afternoon of December 11, 2000. Exhs. 55, 56, 57.

Later that evening, at the meeting of the Greenfield Middle School Building Committee, Greenfield voted to hire Baybutt Construction Corporation to complete the renovations. Exh. 58, 59; Garrity Aff. at ¶ 46. Greenfield notified Seaboard the following day that it would be proceeding "without the Surety's involvement." Complaint at Exh. B. Seaboard thereafter filed the instant action for a declaration that it is exonerated and discharged from any liability under the Bond because Greenfield materially breached its obligations thereunder by hiring its own contractor. *See* Complaint at 4.

## III. STANDARD OF REVIEW

The Court will grant a motion for summary judgment when "the pleadings, de-

positions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no sufficient issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if "the evidence is such that a reasonable party could return a verdict for the nonmoving party," and a fact is material where it "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993), *cert. denied,* 511 U.S. 1126, 114 S.Ct. 2133, 128 L.Ed.2d 863 (1994). To defeat a properly supported motion for summary judgment, "the non-moving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the non-moving party." *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 842 (1st Cir.1993) (quotations omitted), *cert. denied* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). "Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." *Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir.1996).

## IV. DISCUSSION

Seaboard moves the Court to enter summary judgment and declare that Seaboard is discharged from liability under the Bond due to Greenfield's material breach. Conversely, Greenfield moves the Court to enter summary judgment in its favor on its counterclaims, by declaring that Seaboard committed a material breach of the conditions in the Bond by failing to take prompt action under Paragraph 4, and that Seaboard was defaulted upon additional written demand by Greenfield. Greenfield additionally contends that if it may appear that Seaboard tendered performance to undertake completion of the Construction Contract, rejection of that tender was reasonable by Greenfield.

Thus, the Court must initially determine whether either party committed a material breach of the agreement. Central to this inquiry is whether Seaboard undertook its obligations under the Bond in a reasonably prompt manner, or alternatively, whether Greenfield had the right to declare Seaboard to be in default for a material breach due to unresponsiveness or nonperformance. If Seaboard did not promptly undertake its obligations, the Court will thereafter need to determine whether Greenfield gave proper notice to Seaboard of this alleged default and issued an additional demand for performance before Greenfield took it upon itself to hire its own construction manager to complete the Project.

A. Alleged Material Breach and Default by Seaboard

1. Surety's Obligations Upon Contractor Default

Upon notice of the default and termination of the Contractor pursuant to Paragraph 3, the Surety must either make an election to complete the Construction Contract or it must declare to the Obligee that it is refusing to complete the Construction Contract. *See* Bond at ¶¶ 3, 4. Paragraph 4 states that upon Contractor default "the Surety shall promptly and at the Surety's expense" select one of four enumerated options as to the completion of the Construction Contract. *Id.* The option at Paragraph 4.2 states that the Surety will "[u]ndertake to perform and complete the Construction Contract itself, through its agents or through independent contractors."

a. Prompt selection by the Surety

The parties agree that any performance rendered by Seaboard was pursuant to the

option outlined at Paragraph 4.2 for completion of the Construction Contract by the Surety. Greenfield, however, argues that neither Seaboard's selection nor its performance were promptly undertaken as the Bond required, and therefore Seaboard was in material breach of the Bond.

■ Courts have held that promptness inquiries must focus on whether the response of the surety was reasonable, given the circumstances surrounding the underlying default of the Contractor and considering the status and complexity of the project remaining for completion. *See* Robert G. Watt, Vivian Katsantonis, Christopher J. Brasco, *The Surety's Procedures for Preserving and Defending its Rights Following a Default Termination,* 22 Constr. Lawyer 10 (2002) (collecting cases). As such, sureties have been credited a reasonable amount of time for investigating and selecting from performance options such as those outlined in Paragraph 4 of the Bond. *See Farmer's Union Cent. Exchange, Inc. v. Reliance Ins. Co.,* 675 F.Supp. 1534, 1542 (D.N.D.1987). Recognizing the tripartite nature of surety contracts, courts have deemed that it is commercially reasonable to allow the sureties time to investigate the circumstances surrounding a default termination of a contractor before selecting from the various performance options available to them. *See Bd. of Dirs. v. United Pacific Ins. Co.,* 77 Hawai'i 358, 884 P.2d 1134, 1136–38 (Haw.1994). Likewise, the surety is allowed reasonable time to undertake a due diligence review of the work completed and to analyze the tasks remaining for completion. *See Farmer's Union Cent. Exchange, Inc.,* 675 F.Supp. at 1542. Thus, time spent investigating a claim and formulating the proper response is part of the reasonably prompt performance of the surety.

**2. Surety's Obligation to Promptly Undertake Performance**

In evaluating the surety's obligation to act promptly after default, it is apparent that "the surety must either (1) promptly take one of the specified alternative steps to initiate the steps necessary *to resume construction,* or (2) notify the Owner that it will not do so and that the Owner should step in." *Int'l Fidelity Ins. v. County of Rockland,* 98 F.Supp.2d. 400, 420–21 (S.D.N.Y.2000) (emphasis original). In the case of a surety who chooses to implement option 4.2, however, the requirement is quite different:

> [S]pecifically, the surety must *"Undertake* to perform and complete the Construction Contract itself, through its agents or through independent contractors." The [Bond] does not require the surety "to perform and complete" the Construction Contract—something that might take years—but rather requires the surety to "undertake" to perform and complete. The definition of "undertake" is:
>
> 1. To take upon oneself, *agree* to do; *enter into* or upon (a task, journey, etc.)[;] 2. *to give a promise* or pledge that; *contract* [;] 3. to promise, guarantee[;] 4. to make oneself responsible for; *take over as a charge.*

*Webster's New World Dictionary* (2d College Ed.1984). The obligation … [under Paragraph 4.2] was a very specific and limited one: to "agree" or "guarantee" to perform and complete; to *enter into* a commitment—that is, to "contract"; and to "take over" the completion obligation "as a charge." Once the surety has promptly *contracted* for and *entered into* its completion task— and certainly once it has actually "taken over" that completion under a formal takeover agreement and commenced the

work—it has fulfilled its obligation under ¶ 4.2.

*Id.* (emphasis original).

### 3. Seaboard's Response

■ The question of whether Seaboard acted with reasonable promptness in selecting from its options and in beginning to undertake performance must be addressed in light of the extensive dealings in the record between Seaboard and Greenfield from the date of Greenfield's termination of ICC on August 24, 2000, until Greenfield decided to engage its own contractor on December 11, 2000. The Court finds that various facts remain unopposed in the record and reflect entirely favorably on any question of the promptness of Seaboards' response. First, Greenfield took more than a month to respond to Seaboard's initial request for documents following the original Contractor Default, which clearly impeded Seaboard's ability to assess it performance options or to begin performance. Second, Seaboard diligently negotiated a mutually acceptable EWA with Greenfield throughout the month of October 2000 and commenced performance of the emergency work on November 6, 2000. Third, Greenfield requested a definite commitment from Seaboard as of November 20, 2000, and Seaboard clearly responded with a timely commitment in writing that it was choosing to complete the project pursuant to the option at Paragraph 4.2 of the Bond. Fourth, Greenfield actively engaged in extensive negotiations with Seaboard concerning finalizing the Takeover Agreement up until mere hours before the GMSBC meeting on December 11, 2002, where the GMSBC voted to change course and hire a different company. Finally, Greenfield continued to request revisions to the final Takeover Agreement throughout the negotiations, which Greenfield promptly incorporated into the draft agreement being circulated. Ultimately, it was Greenfield who chose not to finalize the Takeover Agreement.

Based on the above, the Court finds that Greenfield has not presented any material issue of fact demonstrating Seaboard to have been in material breach by failing to choose promptly from its performance options or attempting to undertake performance. Seaboard was within its rights to request information about both the underlying Contractor Default and the project status and to withhold from selecting a performance option until receiving this information. Likewise, the record conclusively demonstrates that Seaboard engaged in an active and responsive discourse with Greenfield at all times, and upon Greenfield's specific request, Seaboard definitively made its selection to complete the contract itself pursuant to Paragraph 4.2, as stated in its letter of November 20. Moreover, Seaboard promptly negotiated, finalized, and began work on the interim EWA, stood willing to finalize the Takeover Agreement and completion of the remaining Project, and never was given notice by Greenfield that Greenfield was considering it to be in default on any of its obligations. Similarly, Greenfield never expressly demanded a different performance from Seaboard. Based on the above, the Court cannot find as a matter of law that Seaboard committed a material breach of the terms and conditions ·of the Bond by failing to promptly select and undertake action under paragraph 4. As Seaboard did not commit a material breach, Greenfield's motion for summary judgment must necessarily fail.

### B. Alleged Material Breach By Greenfield

#### 1. Anticipatory Repudiation

■ Greenfield argues that based on its concern that "Seaboard ... might not be

able to start or complete the work in an efficient or timely manner" and/or its "suspicion that Seaboard would be unable to complete [the Project] in a timely manner," Greenfield was entitled to seek another contractor to ensure timely completion of the Project. *See* Greenfield Sum. J. Mem. at 32 (Doc. No. 49). Massachusetts law, however, expressly rejects the doctrine of anticipatory repudiation and requires that a contracting party have the opportunity to perform its contractual obligations without being abrogated of that right. *See Cavanagh v. Cavanagh,* 33 Mass.App.Ct. 240, 598 N.E.2d 677, 679 (1992). Under the Bond, Greenfield was clearly required to let Seaboard attempt to complete the Project, regardless of any questions it may have had about the surety's time frame for completion. Thus, Greenfield absolutely deprived Seaboard of its rights under the Bond when it contracted with Baybutt to complete the Project, because Greenfield did not allow Seaboard to fulfill its completion option. As Greenfield may not use anticipatory repudiation as a defense, Greenfield can only be found to have committed material breach when it foreclosed Seaboard's opportunity to complete the Project.

### 2. Greenfield's Issuance of a Notice pursuant to Paragraph 5

■ Paragraph 5 of the Performance Bond Agreement states in relevant part:

If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner.

Bond at ¶ 5. Seaboard argues that it is entitled to summary judgment because Greenfield failed to issue an additional fifteen day default notice as required by Paragraph 5 of the Bond. As such, Seaboard claims that Greenfield is in breach of the agreement because it never gave Seaboard written notice of a demand for performance of its obligations under the Bond or put Seaboard on any type of notice that it had fifteen days to cure an alleged default. Greenfield, however, counters that Seaboard was deemed to be in default under the Performance Bond after additional notice from Greenfield demanding that Seaboard perform its obligations under the Bond.

Courts have held that notices must be clear, direct, and conclusive upon the receiver. *See* 58 AM. JUR. 2D Notice § 2 ("notice must be clear, definite, explicit and unambiguous") (collecting cases). "Given the consequences that follow a declaration of default, it is vital that the declaration be made in terms sufficiently clear, direct and unequivocal." *L & A Contracting Co. v. S. Concrete Servs., Inc.,* 17 F.3d 106, 111 (5th Cir.1994) (contractor/obligee did not declare subcontractor/principal in default as required by performance bond). Likewise, contractually required notices must always be clear and unambiguous in order to fulfill their intended purpose. *See Comm'r of Corporations and Taxation v. Springfield,* 321 Mass. 31, 71 N.E.2d 593, 596 (1947)

■ Greenfield alleges that it provided four written notices demanding that Seaboard make an election under Paragraph 4 and commence performance, and that because Seaboard failed to take the required action, Greenfield was free to complete the work without jeopardizing recourse against Seaboard under the Bond. To resolve the question of whether notice was given, the Court will examine the four

writings which Greenfield alleges to be notice letters pursuant to Paragraph 5. Greenfield points to letters it wrote to Seaboard dated August 24, 2000 (Exh. 6), September 26, 2000 (Exh. 23), November 15, 2000 (Exhs.41, 42), and November 22, 2000 (Exh. 46), as satisfying its default notice obligations under Paragraph 5.

The first letter is one from Greenfield's attorney dated August 24th, which simply notifies Seaboard that Greenfield has declared ICC to be in default and has terminated ICC as the contractor on the Project. Exh. 6. The letter additionally requests a meeting with Seaboard, yet chiefly serves to alert Seaboard to the default and trigger Seaboard's obligations as Surety under the Bond. The second letter of September 26th, is a transmittal letter which accompanied documents in response to Seaboard's August 25th request for documents in support of Greenfield's Bond claim. Exh. 23. In that letter, Greenfield's counsel explains which documents are included in the shipment and which remained to be sent to Seaboard. Greenfield also indicated that its preference was for Seaboard to complete the project itself pursuant to Paragraph 4.2 of the Bond.

Next, Greenfield's counsel sent two letters on November 15, 2000. The first mainly notified Seaboard that the GMSBC was applying to the Greenfield Town Council for additional funding for the Project and requested "a statement of Seaboard's intentions by Monday, November 20, 2000." Exh. 41. The second letter of November 15th, was a narrative of Greenfield's position that ICC had defaulted on its obligations and justification for the subsequent termination. Exh. 42. In that letter, counsel for Greenfield requested "that Seaboard undertake an objective review of the facts that culminated in the GMSBC decision to terminate ICC, before it decides if it will honor its performance bond" and that it notify Greenfield by November 20th. *Id.* at 2, 7. Finally, the November 22, 2000 letter acknowledges that Greenfield was "somewhat encouraged" by Seaboard's November 20 letter wherein Seaboard stated that it would perform the remedial and contract work. Exh. 46. The letter continued by saying that Greenfield wished to reach "a general agreement on the issues to be covered in the takeover agreement by the end of the day on November 27, 2000, with a written takeover agreement to follow a few days later." *Id.* at 3.

It becomes evident from the correspondence of record and the dealings of the parties that Greenfield did not issue the required written notice. Upon a review of the letters, the Court finds that none of the letters, taken together or separately, rises to the level of giving the initial or an "additional notice" with a demand for performance required by Paragraph 5 of the Bond. First, the letters do not mention Paragraph 5 nor do they speak in any strong language rising to the level of demanding performance or alerting Seaboard to a presumed default. Secondly, they do not address Greenfield's present claim that Seaboard was in material breach for failing to choose or undertake performance with reasonable promptness. Finally, none of the letters reference the Paragraph 5 default provisions or call for Seaboard to remedy its performance within fifteen days.

As to the dealings of the parties, tellingly on December 11, 2000, the parties continued to exchange draft Takeover Agreements and Greenfield continued to add language and request changes. *See* Exhs. 51, 52, 53, 55, 56, 58. This is the same day that the GMSBC ultimately voted to hire another contractor to complete the project. *See* Exh. 75. Moreover, the record reveals

that the draft final Takeover Agreement in circulation on that afternoon was presented to the GMSBC during the meeting and Greenfield's counsel recommended that the GMSBC wait forty-eight hours to attempt to finalize the agreement before entering into a Construction Management Agreement with another contractor. Exh. 58, Ryan Dep. at 163–65.

As such, the Court finds that none of the letters pointed to by Greenfield satisfy the default notice provision of Paragraph 5. Likewise, the Court further finds that Greenfield's conduct in continuing to negotiate the Takeover Agreement up until the evening it voted to hire another contractor expressly belies any assertion by Greenfield that it considered Seaboard to be in material breach and to have been properly declared in default. Because a clear and direct default notice was not served pursuant to Paragraph 5, the Court finds that Greenfield was in material breach of the Bond when it ceased its dealings with Seaboard and hired another company to complete the Project. As such, the Court concludes that summary judgment in favor of Seaboard is appropriate here because Greenfield materially breached the Bond agreement.

## V. CONCLUSION

Greenfield's refusal to allow Seaboard to complete the Project renders the Bond null and void and discharges Seaboard from any and all liability under the Bond. *See St. Paul Fire & Marine Ins. Co. v. City of Green River, Wyo.,* 93 F.Supp.2d 1170 (D.Wyo.2000), *aff'd* 6 Fed.Appx. 828 (10th Cir.2001). Because Greenfield's counterclaims are all stated to arise under the Bond, those claims necessarily fail at this time as well due to Greenfield's material breach of the Bond. *See* Greenfield's Counterclaim at ¶¶ 32, 34; 37, 39, 42. For the reasons stated herein, the Court therefore GRANTS the plaintiff's Motion for Summary Judgment (Doc. No. 58) and DENIES the defendant's Motion for Summary Judgment (Doc. No. 48).

It is So Ordered.