# United States Court of Appeals
## For the First Circuit

No. 03-1453

SEABOARD SURETY COMPANY,

Plaintiff, Appellee,

v.

TOWN OF GREENFIELD,
acting by and through the
GREENFIELD MIDDLE SCHOOL BUILDING COMMITTEE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Frank H. Freedman, U.S. District Judge]

Before

Torruella, Circuit Judge,
Lipez, Circuit Judge,
and Lisi,* District Judge.

Wendy Sibbison, for appellant.
Thomas H. Hayman, with whom Bert J. Capone and Cetrulo &
Capone LLP, were on brief, for appellee.

June 9, 2004

_____

* Of the District of Rhode Island, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  Defendant-appellant Town of Greenfield, acting by and through the Greenfield Middle School Building Committee ("GMSBC")(hereinafter referred to collectively as "Greenfield"), appeals the district court's grant of summary judgment in favor of plaintiff-appellee Seaboard Surety Company ("Seaboard") discharging Seaboard from liability on a construction performance bond.  After careful review, we affirm.

## I.  Background

We summarize the lengthy narrative of the failed relationship between the parties, relating only those facts relevant to our review.  On June 18, 1998, Greenfield contracted with Interstate Construction Company ("ICC") to renovate its Middle School building.  ICC provided the performance bond required by Massachusetts law, with Seaboard as surety.  The bond is a standard performance bond, Form A312, issued by the American Institute of Architects in 1984.  It provides that the Contractor (ICC) and the Surety (Seaboard), jointly and severally, bind themselves to the Owner (Greenfield) for the performance of the Construction Contract, which the bond incorporates by reference.

Paragraph 3 of the bond provides that the surety's obligation under the bond arises after:

> 3.1     The Owner has notified the Contractor and the Surety . . . that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held

-2-

not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2    The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3    The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

Once the owner has complied with the provisions of Paragraph 3, and the surety's obligations are triggered, Paragraph 4 provides that the surety "shall promptly and at the Surety's expense" take one of a list of specified "actions." The action at issue in this case, as described in subparagraph 4.2, is to "[u]ndertake to perform and complete the Construction Contract itself, through its agents or through independent contractors."

Paragraph 5 provides that "[i]f the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on the Bond fifteen days

-3-

after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner."

In compliance with subparagraph 3.1, Greenfield notified ICC and Seaboard on November 12, 1998, and again on March 23, 2000, that it was considering declaring a Contractor Default. On August 24, 2000, after continuous struggle regarding ICC's tardiness, Greenfield sent ICC a notice of default and termination and filed suit in state court. That same day, Greenfield notified Seaboard of ICC's termination and agreed to pay the balance of the contract price to Seaboard or to a replacement contractor, as required by Paragraphs 3.2 and 3.3 of the bond.

On August 25, 2000, Seaboard responded, asserting its need for a reasonable time to investigate, requesting documentation of ICC's default, and reminding Greenfield of the owner's duty to mitigate the surety's damages. Greenfield hired an Interim Construction Management Consultant, Baybutt Construction Corporation ("Baybutt"), to evaluate and to advise the town on the emergency work needed in the interim. Greenfield notified Seaboard that moisture had caused the subflooring of the new floors to buckle and the carpets to detach, and that the allocation of responsibility for this damage (between Greenfield and ICC) was already before the state court.

On September 26, 2000, Greenfield sent Seaboard further documentation regarding ICC's termination and "formally ask[ed] the surety to undertake to perform and complete the construction itself, or through its agents or independent contractors as set forth in the surety contract, paragraph 4.2," with a response requested from Seaboard by October 20, 2000, so that work might begin by November 4, 2000.

On October 11, 2000, representatives of Greenfield, ICC, and Seaboard met. Seaboard agreed to prepare a proposal by October 18th addressing the emergency work. After some delay, Seaboard delivered a proposal to perform the emergency work -- not including the floor remediation – stating that this was not an offer to perform under the bond because ICC's termination remained contested and Seaboard was still investigating its position with respect to the completion of the project and the remediation of the floors.

On October 31, 2000, Greenfield and Seaboard signed an Emergency Work Agreement to mitigate both parties' damages. Seaboard agreed to perform the emergency work, beginning on November 6th and finishing by December 31st, for which Greenfield would pay $207,000. Seaboard hired a Construction Manager, Wayne Sheridan, for the emergency work.

On November 15, 2000, Greefield's attorney faxed three letters to Seaboard's attorney. The first conveyed the conclusion

of Greenfield's interim consultant, Baybutt, that work would need to be commenced by December 1st for the building to be ready for school the next fall. Estimated costs, including moisture remediation, were $5.6 million -- $3.8 million more than the remaining contract funds. The second letter informed Seaboard that the Building Committee had approached the Town Council to appropriate these funds "if Seaboard declines to complete" and insisted again that work needed to commence by early December. The third letter demanded that Seaboard "soon decide if it will honor its obligations . . . under the performance bond and complete the project." This letter reiterated the necessity that work begin by early December and asked Seaboard to commit by November 20th.

On November 20, 2000, Seaboard responded that, while its investigation of ICC's termination continued, Seaboard was "willing to perform the remedial and contract work," and was "prepared to take all necessary action to expeditiously arrive at a comprehensive agreement with [Greenfield] so that the remedial and contract work can be commenced as soon as possible." Seaboard requested further documentation regarding the floor remediation work.

On November 21, 2000, Greenfield sent Seaboard further documentation and, on November 22nd, objected to the Town being required to pay for the entire cost of the floor remediation. While the allocation of responsibility for the floors was still in

dispute, Greenfield offered to split the costs, under reservation of rights. Greenfield also expressed concern about Seaboard's management team and timely completion. Greenfield was concerned that Seaboard's project manager, Wayne Sheridan, was frequently absent from the work site. Greenfield sought the right to review and to approve any new project management team. Greenfield warned Seaboard that if construction did not begin by December 1st, Greenfield "will be compelled to proceed with its other completion options."

Eventually, Greenfield acceded, under reservation of rights, to cover the costs of the floor remediation, and on December 1st, Seaboard sent Greenfield a draft Takeover Agreement. Greenfield proposed revisions and further negotiations ensued. On December 8th, Greenfield's attorney notified Seaboard that the Building Committee would meet on December 11th to decide how to proceed. On December 11th, Seaboard faxed Greenfield a new draft of the Takeover Agreement which identified Sheridan, the Construction Manager with whom Greenfield was dissatisfied, as the proposed Project Manager. At the Building Committee meeting that night, the Committee decided to hire Baybutt to complete the project. The next day, Greenfield notified Seaboard of the decision to proceed without Seaboard's involvement.

On December 22, 2000, Seaboard filed a complaint in the district court seeking a declaratory judgment discharging it from

obligation under the performance bond on the grounds that Greenfield had materially breached the bond by hiring its own contractor. Seaboard claimed that it had elected to complete the contract, as permitted under the bond, but that Greenfield had refused to allow the takeover, and that Seaboard was thus denied the opportunity to limit its financial exposure. Greenfield filed counterclaims, alleging Seaboard's breach of the bond. After discovery, cross motions for summary judgment were filed.

On March 7, 2003, the district court granted Seaboard's motion for summary judgment. Rejecting any anticipatory repudiation defense for Greenfield as disallowed under Massachusetts law, the court held that "[b]ecause a clear and direct default notice was not served pursuant to Paragraph 5, . . . Greenfield was in material breach of the Bond when it ceased its dealings with Seaboard and hired another company." Seaboard Sur. Co. v. Town of Greenfield, 266 F. Supp. 2d 189, 198 (D. Mass. 2003).

## II. **Analysis**

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). For the purposes of summary judgment, "'genuine' means that 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party',

and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.'" Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 (1st Cir. 1993)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). We review de novo the district court's grant of summary judgment, viewing the facts and making all reasonable inferences in favor of Greenfield, the nonmoving party. Rodríguez v. Smithkline Beecham, 224 F.3d 1, 5 (1st Cir. 2000). We may affirm on any ground supported by the record. Id.

The parties agree that Greenfield complied with the notice requirements regarding ICC's default provided by Paragraph 3 of the performance bond. Seaboard argues, however, that Greenfield failed to provide notice of Seaboard's default before terminating Seaboard's involvement, as required by Paragraph 5. Greenfield contends that Seaboard had previously breached the performance bond by failing to take prompt action following ICC's default as required by Paragraph 4 and that Greenfield's communications with Seaboard complied with Paragraph 5's notice requirements.[1]

---

[1] Greenfield argues in the alternative that Paragraph 5 does not make notice a condition precedent of surety default but instead simply provides an optional vehicle through which the owner may protect itself from any future claims of the surety. We find this reading of Paragraph 5 contrary to the unambiguous language of the bond, and, under Massachusetts law, "when the wording of a contract is unambiguous, the terms will be enforced." Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988)(citing Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981)).

We find it unnecessary to address Seaboard's compliance with Paragraph 4. The district court examined the evidence on the issue and denied Greenfield's motion for summary judgment because "the Court cannot find as a matter of law that Seaboard committed a material breach of the terms and conditions of the Bond by failing to promptly select and undertake action under paragraph 4." Seaboard Sur. Co., 266 F. Supp. 2d at 195. The district court opinion ultimately rests, however, on Greenfield's failure to comply with Paragraph 5. The district court concludes that Greenfield's Paragraph 4 claims against Seaboard "necessarily fail . . . due to Greenfield's material breach of the Bond," and describes Greenfield's breach thus: "Because a clear and direct default notice was not served pursuant to Paragraph 5, the Court finds that Greenfield was in material breach of the Bond when it ceased its dealings with Seaboard and hired another company to complete the Project." Id. at 198. The district court therefore concludes that "Greenfield's refusal to allow Seaboard to complete the Project renders the Bond null and void and discharges Seaboard from any and all liability under the Bond." Id. (citing St. Paul Fire & Marine Ins. Co. v. City of Green River, 93 F. Supp. 2d 1170 (D. Wyo. 2000), aff'd, 6 Fed. Appx. 828 (10th Cir. 2001)).

We agree with the district court's conclusion that Greenfield's compliance with Paragraph 5 is dispositive of both parties' claims. Even assuming that Seaboard failed to provide the

-10-

prompt response to contractor default required by Paragraph 4, the surety default provision of Paragraph 5 constitutes an important contractual right of the surety. Paragraph 5 provides the surety fifteen days during which it may attempt to cure the alleged breach prior to default and thus to minimize its economic exposure. Failure to provide this notice constitutes a material breach of the bond. School Bd. of Escambia Cty. v. TIG Premier Ins. Co., 110 F. Supp. 2d 1351, 1353 (N.D. Fla. 2000)("[F]ailure to adhere to a performance bond notification requirement is a material breach, resulting in the loss of an obligee's rights under the bond."); St. Paul, 93 F. Supp. 2d at 1178 ("Courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void."); cf. Dragon Constr., Inc. v. Parkway Bank & Trust, 678 N.E.2d 55, 58 (Ill. App. Ct. 1997)(owner's "failure to provide adequate notice of [contractor's] termination . . . stripped [surety] of its right to limit its liability and constituted a material breach of contract which rendered the surety bonds null and void.").

Greenfield seeks refuge in the contention that under Massachusetts law "compensated sureties . . . ought not to be relieved from their obligations on merely technical grounds, not affecting substantially the character of the undertaking which they

-11-

assumed." Bayer & Mingolla Constr. Co, Inc. v. Deschenes, 205 N.E.2d 208, 211 n.4 (Mass. 1965)(quoting Maryland Cas. Co. v. Dunlap, 68 F.2d 289, 291 (1st Cir. 1933)). While it is true that "Massachusetts courts have held that lack of prompt notice to the compensated surety of a contractor's default (as required by a Performance Bond) does not discharge the surety if it is not harmed," notice requirements "exist[] precisely to provide the surety an opportunity to protect itself against loss by participating in the selection of the successor contractor to ensure that the lowest bidder is hired and damages mitigated." Enterprise Capital, Inc. v. San-Gra Corp., 284 F. Supp. 2d 166, 177 (D. Mass. 2003)(citations omitted). In the context of surety default, the notice provision similarly provides an opportunity for the surety to cure the breach and thus mitigate damages. As the court concluded in Enterprise Capital, "even if [Seaboard] must show injury, loss, or prejudice, it meets this hurdle, given its deprivation of mitigation opportunities." Id.

We must therefore determine whether the record creates a triable issue of fact as to Greenfield's compliance with Paragraph 5 of the performance bond. Paragraph 5 provides that:

> If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety will be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner

shall be entitled to enforce any remedy available to the Owner.

Greenfield contends that several letters it sent to Seaboard, and particularly two letters dated November 15th, constituted "an additional written notice . . . demanding that the surety perform its obligations" in compliance with Paragraph 5 and that Seaboard was thus properly deemed in default fifteen days thereafter and prior to Greenfield's December 11th decision to hire Baybutt to complete the project.

We describe and quote these letters at some length, as our decision rests on whether a reasonable jury could find them to constitute the "additional written notice" required by Paragraph 5. The first, dated September 26, 2000, responds in detail to Seaboard's requests for documentation regarding ICC's termination and concludes thus:

> Lastly, the Building Committee is formally asking the surety to undertake to perform and complete the construction contract itself, or through its agents or independent contractors as set forth in the surety contract, paragraph 4.2. Please be further advised that owner believes that they will require a decision by the surety no later than October 20, 2000 so that work may begin in earnest to move forward on the project by November 4, 2000.

Two additional letters were sent to Seaboard's counsel on November 15th. The first informs Seaboard that Greenfield Middle School Building Committee ("GMSBC") has presented a proposal to obtain additional funding in case Seaboard declines to complete.

It then discusses a report prepared by Baybutt indicating that work must commence by early December in order for the school to be ready for the 2001 school year. The pertinent paragraphs read:

> The GMSBC believes Seaboard has substantial financial exposure to the Town. It would appear that one way for Seaboard to minimize that financial exposure would be to assume performance and complete the contract. The alternative to completion by Seaboard is completion by the GMSBC through a totally different construction team, possibly after receipt of competitive bids. If the GMSBC must obtain competitive proposals, the completion costs could rise even higher than Baybutt's estimate.
>
> The Greenfield Town Council is scheduled to vote on the GMSCB's $4.35 million request for additional funding on November 21, 2000. The GMSBC has asked that Seaboard provide me with a statement of Seaboard's intentions by Monday, November 20, 2000.

The second letter of November 15th begins thus: "Seaboard Surety Co. must soon decide if it will honor its obligations to the Greenfield Middle School Building Committee . . . under the performance bond and complete the project." It explains the GMSBC's insistence that Seaboard respond promptly:

> The GMSBC must now decide how it will complete the project. It is still the GMSBC's preference to have Seaboard complete. Seaboard has been aware of the problems with ICC for several years and Seaboard has had two and one half months since ICC's termination to assess and determine its position on completion. The time for Seaboard to make a decision is here.
>
> The GMSBC is concerned by Seaboard's indecision regarding completion of the Project and is concerned that Seaboard may be giving too much credit to ICC's explanations and

-14-

excuses as to what went wrong on the project. The GMSBC asks that Seaboard undertake an objective review of the facts that culminated in the GMSBC's decision to terminate ICC, before it decides if it will honor its performance bond.

The letter then presents a detailed explanation of Greenfield's decision to terminate ICC. It concludes thus:

> The critical issue, at this time, is to determine how the project will be completed. The GMSBC believes it is in the best interests of the Town and Seaboard to work together to complete the Project since a mutual effort will be required to get the school opened as quickly as possible. If there are differences in our positions that cannot immediately be resolved, the GMSBC will entertain the adoption of solutions that will allow the parties to "agree to disagree" over those differences, as long as construction progresses. If Seaboard assumes completion of the Project and adheres to a reasonable construction schedule, the GMSBC's consultants believe that the Project can still be completed before the September 2001 school opening. If, however, the GMSBC is compelled to develop new bid packages and receive competitive proposals to complete, the increases in project cost and the delay in completion could be even more severe than the GMSBC's current projections.
>
> Should Seaboard decide to honor its performance bond, there will be a substantial amount of work that will need to be completed in a timely manner. Seaboard will need an experienced project management team on site to carefully direct the work.
>
> Please ask Seaboard to give this matter its immediate and careful consideration. The GMSBC has asked that Seaboard provide it with an indication of its intentions by November 20, 2000, since an important vote in the Town government on financing the completion of the work, has been scheduled for November 21, 2000.

-15-

The final letter is dated November 22, 2000, and begins thus:

> The [GMSBC] is somewhat encouraged by your November 20, 2000 correspondence indicating [Seaboard's] position on completing the Project. The GMSBC wants Seaboard to complete the Project and is anxious to get the work underway. However, the GMSBC has concerns with Seaboard's position that the GMSBC must pay for all the costs to remedy the floor damage . . . In addition to resolving the question of who between Seaboard and the GMSBC pays what portion of the floor remediation work, the GMSBC has a number of additional concerns that must be satisfactorily addressed in a takeover agreement.

The letter proceeds to describe the GMSBC's position on the floor remediation costs and proposes that Seaboard and the GMSBC split the costs, reserving their rights against one another and against ICC, until the allocation of responsibility is determined in court. The letter then lists and discusses seven "other key issues that must be satisfactorily addressed in any takeover agreement." It concludes thus:

> Please contact me at your earliest opportunity, to discuss Seaboard's position regarding the above issues. The GMSBC would like to be able to reach a general agreement on the issues to be covered in the takeover agreement by the end of the day on November 27, 2000, with a written takeover agreement to follow a few days thereafter. Should we be able to successfully negotiate a takeover agreement, construction representatives of all parties should be prepared to meet on short notice at the site . . . .
> Time is truly of the essence in negotiating a takeover agreement and commencing the completion of the work. The

-16-

GMSBC has targeted December 1, 2000 as the date by which work on the completion of the contract should commence. The GMBSC is prepared to do what is necessary to meet that date. If the takeover agreement cannot be reached, the GMSBC will be compelled to proceed with its other completion options.

The district court found that none of the letters, taken together or separately, constituted the additional written notice required by Paragraph 5 of the bond, because the letters do not demand performance in a manner sufficient to alert Seaboard to a presumed default, nor do they indicate that Seaboard was in material breach for failing to choose or to undertake performance with reasonable promptness, nor do they reference the Paragraph 5 default provisions or warn that Seaboard will be deemed in default in fifteen days. Seaboard Sur. Co., 266 F. Supp. 2d at 197. We agree.

In the context of contractor default, courts have found that "[a] declaration of default sufficient to invoke the surety's obligations . . . must be made in clear, direct, and unequivocal language." L & A Contracting Co. v. S. Concrete Serv., Inc., 17 F.3d 106, 111 (5th Cir. 1994)(finding insufficient notice of default when owner's letters never mentioned the word "default"); Elm Haven Constr. Ltd. P'ship v. Neri Constr., LLC, 281 F. Supp. 2d 406 (D. Conn. 2003) (insufficient notice when letters only complained about performance and financial status); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc., 986 F. Supp.

82, 86 (D. Conn. 1997) (insufficient notice when letters only mention delay in performance).  The district court applied this standard in the related context of surety default before us and concluded that Greenfield's letters failed to provide "a clear and direct default notice" to Seaboard.  Seaboard Sur. Co., 266 F. Supp. 2d at 198.

While the standard for sufficiency of notice applied by the district court comports with the general standard that "[n]otice must be clear, definite, explicit, and unambiguous," 58 Am. Jur. 2d Notice § 2, there is no dispute that the performance bond at issue here is governed by Massachusetts law.  Although neither party before us nor the decision below suggests that Massachusetts law provides a relevant standard for sufficiency of notice meaningfully distinct from that applied by the district court, we must address the issue.  In introducing the "clear, direct and unequivocal" standard, the district court states, citing Comm'r of Corps. & Taxation v. Springfield, 321 Mass. 31, 35 (1947), that "[l]ikewise, contractually required notices must always be clear and unambiguous in order to fulfill their intended purpose."  Seaboard Sur. Co., 266 F. Supp. 2d at 196.  Comm'r of Corps., however, states the requirement under Massachusetts law that "[n]otices required by law or by contract to be given by one party to the other in order to establish rights or obligations must state with reasonable certainty the essential facts required by law

-18-

or by contract." Comm'r of Corps., 321 Mass. at 35. This principle has been applied to suggest that the "form [of notice] is not important but it must convey with reasonable certainty the information reasonably needed to serve the statutory purpose." Carey v. Planning Bd. of Revere, 335 Mass. 746, 748 (1957). In both Carey and Comm'r of Corps., the notice in question was found to be insufficient because it failed to supply the information necessary to serve the purpose of the statutory notice provision at issue. Carey, 335 Mass. at 747; Comm'r of Corps., 321 Mass. at 35.

As discussed earlier, the purpose of the notice provision in Paragraph 5 of the performance bond is to provide the surety with a fifteen-day period during which it might attempt to cure the alleged breach prior to default. As Greenfield's letters to Seaboard did not alert Seaboard to a presumed default, nor indicate that Seaboard was in material breach, nor refer to Paragraph 5, nor warn that Seaboard would be deemed in default in fifteen days, no reasonable jury could find that Greenfield's letters "convey[ed] with reasonable certainty the information reasonably needed" to serve the purpose of Paragraph 5's notice requirement. Carey, 335 Mass. at 748. Therefore, as Greenfield's letters to Seaboard fail to create a triable issue of fact under this threshold standard for sufficiency of notice under Massachusetts law, we need not explore the question further. Paragraph 5 of the performance bond provided Seaboard with a fifteen-day period during which it might attempt to

-19-

cure the alleged breach.   No reasonable jury could find that Greenfield's letters put Seaboard on notice that this fifteen-day period had commenced.[2]

## III.  Conclusion

Greenfield failed to provide an "additional written notice" that could reasonably be found to put Seaboard on notice that the fifteen-day period had begun after which Seaboard would be deemed in default under Paragraph 5.   This material breach by Greenfield discharges Seaboard from liability under the bond as a

---

[2]  The negotiations and exchanges of proposed and revised takeover agreements that ensued and continued until the day of the Building Committee's vote also belie Greenfield's claim that the letters served as notice of default.   Whether or not Seaboard was inappropriately demanding concessions in the negotiations, as Greenfield alleges, the record shows that neither Seaboard nor Greenfield framed the proceedings in the context of impending default.   Greenfield argues that its efforts to work toward a compromise after December 1st should not be held against it, contending that Greenfield's efforts "to obtain even dilatory performance" did not excuse Seaboard from its contractual duty to act promptly.   Bayer & Mingolla Const. Co., 205 N.E.2d at 212.   Similarly, however, Greenfield's continued efforts toward compromise do not excuse Greenfield from its obligation to provide an additional written notice of default to Seaboard as required by Paragraph 5.

Greenfield also argues that Seaboard's complaint conceded that the November 15th letter complied with Paragraph 5.   The complaint states that "[o]n or about November 15, 2000, Greenfield (through its attorneys) called upon Seaboard to undertake completion of the Project, and called for a response by November 20, 2000.   Seaboard duly responded on November 20, 2000, stating that Seaboard was willing to undertake the work in question."   No reasonable jury could find that Seaboard's characterization of Greenfield's November 15th letter as "call[ing] upon Seaboard to undertake completion" conceded that the letter provided notice to the surety that the fifteen-day period before it would be deemed in default under Paragraph 5 had begun.

matter of law.  The district court's grant of summary judgment is therefore affirmed.

**<u>Affirmed</u>**.

**"Dissenting opinion follows"**

**LIPEZ, Circuit Judge (Dissenting).** Paragraph 5 of the surety bond provides in relevant part:

> If the Surety does not proceed as provided in Paragraph 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner.

On August 24, 2000, Greenfield notified Seaboard of ICC's default and termination, and agreed to pay the balance of the contract price to Seaboard or to a replacement contractor pursuant to Paragraphs 3.2 and 3.3 of the bond. Thus, after August 24, 2000, Seaboard was required to "proceed as provided in Paragraph 4 with reasonable promptness." If it did not, Greenfield was entitled to deliver the "additional written notice" under Paragraph 5, beginning the 15 day period before Seaboard would be deemed in default.

As the majority recognizes, Massachusetts law governs the provisions of the surety bond. In Massachusetts, "[n]otices required by law or by contract to be given by one party to the other in order to establish rights or obligations must state with reasonable certainty the essential facts required by law or by contract, as the case may be." Comm'n of Corps. & Taxation v. Springfield, 321 Mass. 31, 35 (1947). See also Carey v. Planning Bd. of Revere, 335 Mass. 746, 748 (1957) ("[The] form [of the

-22-

notice] is not important but it must convey with reasonable certainty the information reasonably needed to serve the statutory purpose."). In this case, the essential information required by Paragraph 5 was a "demand[] that the Surety perform its obligations under [the] Bond." Thus, our task is to determine whether a reasonable jury could find that Greenfield's communications to Seaboard constituted an "additional written notice" that, with reasonable certainty, "demand[ed] that the Surety perform its obligations under [the] Bond."

In my view, there are several communications between Greenfield and Seaboard that a reasonable jury might find meet this requirement. As early as September 26, 2000, Greenfield had formally asked Seaboard to perform its obligations under the bond and had laid out a timetable for Seaboard's decision:

> Lastly, [Greenfield] is formally asking the surety to undertake to perform and complete the construction contract itself, or through its agents or independent contractors as set forth in the surety contract, paragraph 4.2. Please be further advised that [Greenfield] believes that they will require a decision by the surety no later than October 20, 2000 so that work may begin in earnest to move forward on the project by November 4, 2000.

A November 15, 2000, letter again called on Seaboard to decide whether it would complete the project:

> [Greenfield] must now decide if it will complete the project. It is still [Greenfield's] preference to have Seaboard complete. Seaboard has been aware of the problems with ICC for several years and

-23-

> Seaboard has had two and one half months since ICC's termination to assess and determine its position on completion. The time for Seaboard to make a decision is here.

The November 15th letter concluded by asking that "Seaboard provide [Greenfield] with an indication of its intentions by November 20, 2000," setting yet another deadline for Seaboard's decision.

Finally, a November 22, 2000, letter set a third deadline and clearly indicated that Greenfield was prepared to pursue completion by another contractor if Seaboard did not perform its obligations under the bond:

> Time is truly of the essence in negotiating a takeover agreement and commencing the completion of the work. [Greenfield] has targeted December 1, 2000 as the date by which work on the completion of the contract should commence. [Greenfield] is prepared to do what is necessary to meet that date. If the takeover agreement cannot be reached, [Greenfield] will be compelled to proceed with its other completion options.

Each of these letters asked Seaboard to either perform its obligations under the bond or allow Greenfield to pursue other options. In my view, a reasonable jury could find that these letters constituted an "additional written notice" that, with reasonable certainty, "demand[ed] that the Surety perform its obligations under the Bond."

The majority reasons that "[a]s Greenfield's letters to Seaboard did not alert Seaboard to a presumed default, nor indicate that Seaboard was in material breach, nor refer to Paragraph 5, nor

-24-

warn that Seaboard would be deemed in default in fifteen days, no reasonable jury could find that Greenfield's letters 'convey[ed] with reasonable certainty the information reasonably needed' to serve the purpose of Paragraph 5's notice requirement." Paragraph 5, however, does not require that Greenfield's notice contain any of these provisions. It merely requires a "demand[] that the Surety perform its obligations under the Bond." If the parties had wished to require a more comprehensive notice -- including explicit reference to Paragraph 5 and a recitation of the consequences of Greenfield's notice -- they could have altered Paragraph 5's requirements. They did not do so, and it is not our province to read more stringent requirements into that provision.

Moreover, Greenfield was not required by principles of contract law to educate Seaboard as to the consequences of Greenfield's demand that Seaboard perform its obligations under the bond. "[U]nder Massachusetts law, 'one who signs a writing that is designed to serve as a legal document . . . is presumed to know its contents.'" Salois v. Dime Sav. Bank, 128 F.3d 20, 26 n.10 (1st Cir. 1997) (quoting Hull v. Attleboro Sav. Bank, 33 Mass. App. Ct. 18, 24 (1992)). Thus, we must presume that Seaboard understood Paragraph 5's requirements, including that it would be deemed in default 15 days after receiving additional written notice demanding that it perform its obligations under the bond. It was Seaboard's responsibility to protect its rights by acting within its 15 day

-25-

window of opportunity. Greenfield's only duty was to provide the notice required by Paragraph 5 in compliance with the Massachusetts "reasonable certainty" standard, regardless of whether Seaboard recognized that the notice formally triggered the terms of Paragraph 5. See, e.g., Univ. Emergency Med. Found. v. Rapier Inves., Ltd., 197 F.3d 18, 21 (1st Cir. 1999) (holding that the parties to a contract may specify the manner of sufficient termination notice in the terms of the contract); Westmoreland v. Gen. Acc. Fire & Life Assur. Corp., 144 Conn. 265, 270 (1957) ("It is always competent for parties to contract as to how notice shall be given, unless their contract is in conflict with law or public policy. When they do so contract, the giving of a notice by the method contracted for is sufficient whether it results in actual notice or not.") (collecting cases).

Greenfield and Seaboard have been engaged in a long and bitter dispute over their respective obligations under the surety contract. The financial stakes are considerable for both parties. We should not resolve this case with a legal ruling that rewrites the content of the notice required by Paragraph 5 of the bond. Rather, whether Greenfield's multiple letters constituted an adequate "demand[] that the Surety perform its obligations under [the] Bond" is a quintessential jury question. I would therefore vacate the entry of summary judgment and remand to the district

-26-

court so that this issue could be resolved by the appropriate fact finder.

I respectfully dissent.